| | |
|---|---|
| **DEWAYNE BAIRD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Cause No. 1:17-cv-3848-WTL-DML** |
| | ) |
| **PROGRESS RAIL MANUFACTURING,** | ) |
| | ) |
| **Defendant.** | ) |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (Dkt.

No. 42). The motion is fully briefed and the Court, being duly advised, **GRANTS IN PART**

**AND DENIES IN PART** the motion for the reasons set forth below.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the

properly supported facts asserted by the non-moving party must be believed, and all reasonable

inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th

Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor."). However, a party who bears the burden of proof

on a particular issue may not rest on his pleadings, but must show what evidence he has that

there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*,

325 F.3d 892, 901 (7th Cir. 2003). The non-moving party bears the burden of specifically

identifying the relevant evidence of record, and "the court is not required to scour the record in

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001). Therefore, with regard to each of the Plaintiff's claims, the Court has considered the evidence of record that the Plaintiff, as the non-moving party, points to in his brief as supporting his arguments with regard to that claim. *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) ("'It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" (quoting *Liberles v. Cook Cty.*, 709 F.2d 1122, 1126 (7th Cir. 1983)).

## II. <u>BACKGROUND</u>

The relevant facts of record, viewed in the light most favorable to the Plaintiff, as the non-moving party, are as follow. The parties include—and dispute—many additional facts that are not relevant to the Court's disposition of the instant motion and therefore are not included herein.[1] This includes many facts proffered by the Defendant that are not consistent with the Plaintiff's facts. These are not relevant to the summary judgment discussion because, at the summary judgment stage, "[p]laintiffs are entitled to the benefit of any admissible evidence favoring their claims and conflicts in the evidence, as well as reasonable inferences favorable to their claims." *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1063-64 (7th Cir. 2018); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (A "judge's function" on summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). The Defendant essentially urges the Court to weigh

---

[1]The Court does not mean to suggest that facts omitted herein are not relevant to the claims in this case or will not be relevant at trial.

the evidence as to several of the facts asserted by the Plaintiff, which, of course, the Court may not do on summary judgment.

Plaintiff Dewayne Baird is a combat veteran who has permanent damage to his spine and neck due to an injury he sustained while serving in the Navy. Baird was hired by Defendant Progress Rail Manufacturing ("Progress Rail") as a welder in December 2013. He identified himself as a disabled veteran when he applied for the job. He was interviewed and promoted to Test Technician on January 26, 2015, by Test Department Manager Brian DeWitt and Test Department Supervisor Josh Hiday. Hiday and DeWitt, who became Baird's supervisors, were aware of Baird's veteran status. In addition to promoting him to Test Technician, DeWitt and Hiday awarded Baird several raises during his tenure at Progress Rail.

Baird continued to require treatment for his injury after he began working for Progress Rail. He requested and was granted intermittent FMLA leave each year from 2014 through 2017. Baird took FMLA leave for medical appointments in 2014, 2015, and 2016. Progress Rail's records indicate that Baird took FMLA leave during the pay periods ending October 9, 2016; October 23, 2016; and December 25, 2016.[2] Baird was not denied any FMLA leave that

_____

[2]During discovery, Progress Rail produced an internal tracking document that shows that Baird took FMLA leave in October and December 2016. However, in its reply brief, Progress Rail asserts that Baird's last FMLA leave was taken in May 2016. In support of this assertion, Progress Rail submits a different document purporting to show Baird's FMLA use as "printed from the Empower database," along with the affidavit of Angela Kirk, who states that "[p]ursuant to the disclaimer produced with Empower records of FMLA hours used by Baird and other Test Employees (DEF002010), the tracking tool contained in some files before 2017 may not have been kept up to date. Therefore, as part of the production, we advised Plaintiff that Empower is the only accurate source of data." Dkt. No. 55-2 at 3. The Court notes that Kirk herself does not aver that the Empower notes are accurate, only that "we" advised Baird that they were. And, in fact, the "disclaimer" in question states only that "[t]he hours on the following sheets are from empower and the manual tracking and are *probably* the most accurate." Dkt. No. 55-2 at 25. Inasmuch as one set of Progress Rail's own records supports Baird's factual

3

he requested. However, in 2015, Dewitt and Hiday "strongly advised" Baird not to use FMLA leave because he could be "scrutinized" for doing so. Dkt. No. 46-1 at 162. Hiday told Baird that "[w]e're cracking down on FMLA" and that Baird "could still get an occurrence for" using it, meaning that he could still accrue points under the company's attendance policy for using FMLA leave, even though FMLA leave was supposed to be exempt from points under the policy. *Id.* at 155. Because of this warning, there were a "couple of times" that Baird chose not to use FMLA leave when he otherwise would have. However, Baird never requested FMLA leave and had that request denied and was never actually penalized under the point system for using his FMLA leave.

In March 2015, DeWitt counseled and coached Baird for being away from his work area too frequently, taking excessive smoke breaks, and failing to stay on task and develop knowledge. Baird does not believe that that coaching was related to FMLA or disability, as several other employees received coaching at the same time.

While Baird worked in the Test Department, DeWitt and Hiday observed that Baird could not work independently, was difficult to train, was not efficient, and took 3-4 times as long as other Test Technicians to troubleshoot an issue, even those with the same amount of time on the job. As a result, Hiday assigned Baird to tasks that did not require troubleshooting, like moving locomotives. According to DeWitt, Baird "had a habit of not being where he needed to be and not learning what he needed to learn." Coworkers complained that he was "always gone. He's

---

assertion, viewing the evidence of record in the light most favorable to Baird, the Court accepts that assertion as true for purposes of resolving the instant motion.

never there. He's not really interested in learning the job." Dkt. No. 44-5 at 23. As a result, no one wanted to work with him. *Id.* at 29.

Tom Walsh, a test engineer in the Test Department who reported to Hiday, was involved in training Baird. He found Baird to be "very intelligent and a good, hard worker," who "responded well to training" and "showed an interest in his job and learning more about it." Dkt. No. 46-7 at 1. In the spring of 2015, Walsh was summoned to a private meeting with Hiday and DeWitt, who asked Walsh to "create a record that Mr. Baird was trained on various tasks and procedures." Walsh believed it was clear that he was being asked to "create a training record regarding Mr. Baird that would later be used to justify his termination and that Mr. Hiday's and Mr. Dewitt's intention was to find a way to terminate Mr. Baird's employment." *Id.* at 1-2.[3]

For several months in 2015, Baird and two other employees were "loaned out" to the cab assembly department. Hiday, who remained Baird's direct supervisor, observed that Baird was frequently "MIA"[4] when Hiday was in the Cab area. Cab supervisor Rob Heinrich and Baird's coworkers "corroborated that and other performance issues." Dkt. No. 44-1 at 4. As a result, Hiday conducted a counseling session with Baird on September 14, 2015, in which he identified the following performance issues: "quality of work being performed"; "being found outside of

_____

[3]Baird's Statement of Facts cites to these statements in Walsh's affidavit as evidence that Hiday and DeWitt asked Walsh to "fabricate" Baird's training record. Dkt. No. 45 at 4. The affidavit does not actually say that, and "creating a record" that training was conducted is not the same as "fabricating" that record; "creating a record" could simply mean documenting training that had actually occurred but had not been documented in writing. Indeed, it also could mean conducting the training in the future and ensuring that it was properly documented. Without more, the Court finds that Walsh's affidavit does not support the inference that Walsh was asked to fabricate records.

[4]"MIA" is used in Hiday's affidavit; presumably it means "missing in action."

work area"; "quantity of work being performed; and work ethic is poor (teamwork)." Dkt. No. 44-11 at 12.

In 2015, Progress Rail implemented a new software platform for performance evaluations. In December 2015, Progress Rail held a meeting regarding the performance review process to advise supervisors how to complete their employees' 2015 evaluations. During the question and answer period at the end of the meeting, a new supervisor asked a question about how to handle the following hypothetical situation: when evaluating two employees, you determine that their performance was otherwise the same, but one of them is "here every day" and the other "is on FMLA and he's only been here 60 days. . . . You know, how do you evaluate that . . . and where do we evaluate that at?" on the performance evaluation form. Dkt. No. 46-6 at 121.[5] Ulrich answered the question; Roberts described her answer as follows:

> I think it was more so in regards of you need to use that in consideration when looking at two different individuals, as in this guy adds up the same way this guy adds up, but this guy is here 90 percent of the time, this guy's only here 80 percent of the time.
>
> So not—only not just because this guy is on FMLA, but the more thing they're going on is this guy's here 90 percent of the time. I'm going to pay a guy that's going to be here 90 percent of the time over a guy that's only going to be here 70 percent of the time for me.

---

[5]These factual assertions are supported by the deposition testimony of Wes Roberts. Progress Rail characterizes Roberts' testimony as "an uncorroborated, after-the-fact, and provably inaccurate report by a fired" employee, Dkt. No. 59 at 13, and argues that "overwhelming evidence establishes that no manager or supervisor, including DeWitt, was told to link or did link FMLA and merit raises." *Id.* Progress Rail is correct that there is evidence in the record that disputes Roberts' account and calls the accuracy of his testimony into question. However, Progress Rail's argument ignores the fact that the Court must, at this stage, view the evidence—which includes Roberts' testimony—in the light most favorable to Baird.

Dkt. No. 46-6 at 122. In other words, Roberts interpreted Ulrich's answer as meaning that FMLA leave should be used as a consideration in completing employees' performance evaluations.

Due to technical problems, the computer program was unavailable in January 2016 when supervisors completed their employees' performance reviews. Using a written form, Hiday, Baird's direct supervisor, evaluated each of his hourly employees, including Baird, in six categories, assigning ratings of "Did Not Meet Performance Expectations," "Expected Level of Performance," "Exceeded Performance Expectations," and "Superior Performance" for each category. Hiday ranked Baird as "Expected Level of Performance" in all categories except one. In the category labeled "Results- and Action-Oriented – Acts with sense of urgency," Hiday ranked Baird as Did Not Meet Performance Expectations and commented: "Dewayne can hardly improve if he continues neglecting opportunities in front of him. After a coaching session in September, Dewayne has made a complete turn around and is proving to be a great asset to the company." Dkt. No. 44-11 at 9. Hiday gave his handwritten evaluations to DeWitt, who reviewed Hiday's recommendations in light of his own knowledge of and observation of Baird's skills and performance. DeWitt determined that, based on his performance rating, Baird should receive a 1% merit raise.[6] Finally, DeWitt met with Plant Manager Jim Rumpf, who reviewed

---

[6]In its statement of facts, the Defendant states the following: "Finally, DeWitt met with Plant Manager Jim Rumpf, who approved and assigned a percentage merit increase from 0% to 4%, divvying up a finite 'pot' of funds allocated for merit raises in each department. (DeWitt Dep. pp. 92, 103, 104, 111; Ulrich Dep. pp. 31, 123, 145." Later, the Defendant states: "Then, DeWitt met with Plant Manager Rumpf who ultimately approved Baird's evaluation and assigned a 1% merit increase." To the extent that these assertions suggest that it was Rumpf alone who determined that Baird should receive a 1% raise, the evidence cited does not support that. Rather, DeWitt testified that he made that decision, Dkt. No. 44-5 at 10, and then he had to defend that decision to Rumpf, *id.* at 28.

the performance rating and gave his own input. At some point, the "expected level" rating for "quality and quantity of work" was changed to a rating of "Did Not Meet Performance Expectations."[7] The comment under that category reads "Needs to work on attendance." *Id.* at 10. Baird was given an overall rating of "Did Not Meet Performance Expectations"; that rating was determined by either DeWitt or Rumpf.

On January 13, 2016, DeWitt met with Baird to present his performance evaluation. Baird expressed unhappiness with the overall ranking and with the handwritten "needs to work on attendance" note. Baird asked Dewitt "How am I expected to improve on my attendance when I only have 1 point for 12 months, two half occurrences?[8] I've got a perfect attendance record. It's just I had to leave early twice because I was sick." Dkt. No. 44-1 at 29. DeWitt responded "You have FMLA, don't you? . . . [I]f you didn't have FMLA, your attendance would have more points, so therefore you need to work on your attendance." *Id.* When Baird asked

---

[7]There is a dispute of fact regarding this rating. It is clear that at some point "Expected Level of Performance" was marked on the form and that someone used white-out to remove that mark. Hiday has submitted an affidavit in which he states that "[t]he comments, changes, and 'X's' on the 2015 evaluation of Dewayne Baird were written *by me*. The only possible exception is the 'Overall Rating.' I cannot recall whether I initially rated Baird as "meeting" or "not meeting" expectations." Dkt. No. 44-11. However, DeWitt testified that he, not Hiday, marked the overall rating on the form, that he does not remember which rating he chose, and that Rumpf "probably" is the one who scribbled out the other three ratings on the form. Dkt. No. 44-5 at 27. And Baird testified that Hiday told him that he had given Baird the "Expected Level of Performance" rating for the "Quality and Quantity of Work" category and had not made the change on the form to lower the rating. Dkt. No. 44-1 at 30. The facts set forth above reflect the evidence of record viewed in the light most favorable to the Plaintiff. The Plaintiff's statement in his brief that "Hiday . . . told Mr. Baird that he marked him as meeting expectations in every category," Dkt. No. 45 at 4, is not supported by the testimony cited by Baird, as he specifically states in that testimony that he did not ask Hiday about the other category in which he received a "Did Not Meet Performance Expectations" rating, Dkt. No. 44-1 at 30.

[8]Progressive Rail had a progressive attendance policy under which points were assessed for each attendance event. Ulrich's testimony supports Baird's view that an employee with only one point for a twelve-month period should not have been counseled to work on his attendance.

him "Are you joking? You have no other reason than because I have FMLA?" DeWitt answered that he did not. *Id.*

The following day, Baird complained to HR Director Ulrich that his FMLA leave had been used against him on his performance review. Ulrich discussed Baird's concerns with DeWitt. DeWitt admitted that he had "referenced" Baird's use of FMLA during his meeting with Baird. DeWitt explained to Ulrich that the problem was that Baird was not "far enough along in his training to work independently" and that he "doesn't have as much training on the units as others that started with him because he isn't here as much." Dkt. No. 44-7 at 23, 27. Ulrich's notes from her conversation with DeWitt contain the following: "[DeWitt] considers attendance to be all encompassing of time away from work not just occurrences [that cause points to be assessed under the progressive attendance policy]. [Baird] happens to be on FML which causes him to be away from work. He went on to say he has no idea why [Baird] has FML and doesn't care to know, he just knows he doesn't have as much time in training as his peers." *Id.* at 28. Ulrich's notes further state: "In hindsight, [DeWitt] regrets mentioning anything about his FML, but insists it wasn't meant that he was holding it against [Baird]. He mentioned it as a reason why he doesn't have as much time training on the units, simply because he's not at work as often as his peers." *Id.* at 30.

Ulrich, DeWitt, and Baird met on January 18, 2016, to discuss Baird's complaint. DeWitt told Baird that when he mentioned FMLA during the performance review meeting, "we were talking about the time you trained on the units doing various operations. And you said I only had one occurrence. And I responded it's your overall absences, including your FML. You have had more time away from work than others, which has impacted your training time." Dkt. No. 44-5 at 30.

Following Baird's complaint that his FMLA leave was used against him, DeWitt assigned what Baird characterized as "crappy jobs" to Baird, such as cleaning out pits after it rained.

In July 2016, Baird complained to Rumpf about his 2015 ranking and raise being affected by his FMLA leave, and also complained that a newly hired Test Technician was making $26.50 per hour, which was more than Baird was making. The decision was made that all of the Test Technicians who had completed a training course at Ivy Tech would be given a pay increase to $26.50 per hour effective August 8, 2016, regardless of what their current rate of pay was. This included Baird.[9]

Baird's employment with Progress Rail was terminated on January 26, 2017, for a "Blue Flag violation." Progress Rail had safety rules and procedures relating to locomotives with blue flags; these were well-communicated to Baird and he understood them. A Blue Flag on a locomotive meant that the locomotive could not be moved or coupled to under any circumstances because a person could be working in or on it. Test Department employees were required to follow specific procedures before a blue flag could be removed and the locomotive could be

---

[9]The Defendant's Statement of Undisputed Material Facts contains the following assertion: "Thus, in 2016, Baird earned the same as others who had received higher merit raises, mitigating any harm from a 1% raise in January 2016. (DEF1109, DEF244-DEF250)." Dkt. NO. 43 at 9-10. The cited evidence does not fully support the asserted fact. The cited documents demonstrate that six employees with the job title "Signal Technician I," including Baird, completed a test training course and had their hourly rates increased to $26.50 per hour effective August 8, 2016. Those documents do not provide any information about who the "others who had received higher merit raises" in January 2016 were or what those individuals were being paid. It is reasonable to infer, however, that Baird's January 2016 merit increase would not have raised his rate of pay to $26.50 under any circumstances, as that would have been an increase of over 16%. Therefore, it is reasonable to infer that the economic effect of any lower merit increase he received in January 2016 ceased as of the August 2016 pay increase.

moved.  Because the failure to follow these procedures could result in serious injury or death, Blue Flag violations were terminable offenses.

The incident that led to Baird's termination occurred on January 25, 2017.   At the beginning of the shift, DeWitt told Baird to let another employee, Jacob Howard, handle the locomotive moves that day.  Baird's role was to offer assistance and answer any questions that arose.  Shortly thereafter, Baird instructed Howard and Damon Emilien, who was a contract employee, to move a locomotive indoors.[10]  At least two employees are needed to move a locomotive; one to serve as the driver and the other to serve as the ground guide.[11]  For the move in question, Howard was the driver and Emilien was the ground guide.  Baird instructed Howard and Emilien to "inspect that unit, and after they inspected it, to hook the running unit up to it and bring it in."  While they did that, Baird went inside to retrieve derailer keys from DeWitt so that another employee, production supervisor Ronnie King, could unlock the derailer, which was a

_____

[10]Baird states in his Statement of Facts that Baird had moved the same locomotive the previous day, that it had been moved again during the night shift, and that "[s]ince trains have to be yellow flagged before being moved, whoever moved it overnight should have put a yellow flag on it, not a blue flag."  Dkt. No. 45 at 8.  That statement is true, but it also is irrelevant, unless Baird is suggesting that the locomotive should still have had a yellow flag on it in the morning when Baird instructed Howard and Emilien to move it.  That suggestion is not supported by the evidence.  The record makes clear that a blue flag is placed on a locomotive to indicate that someone is in, on, or around it.  A yellow flag could have been placed on the locomotive during the night move and then been replaced by a blue flag sometime after that move, but prior to the morning move, because someone was working on or around the locomotive.

[11]Progress Rail asserts in its statement of facts that "[t]wo ground guides are required to move a unit from the yard into the building."  Dkt. No. 43 at 10.  That is true, but a bit misleading.  DeLong testified that only one ground guide is necessary "unless you're coming inside the building."  Dkt. No. 44-3 at 10.  And, in fact, Baird's version of events is consistent with this rule:  his testimony is that Emilien served as the sole ground guide at the beginning of the move, and then Baird served as the second ground guide at the point that the locomotive was ready to enter the building.

necessary step in moving the locomotive inside. Dkt. No. 44-1 at 59. Baird did not check the locomotive for blue flags himself; he left that to Howard and Emilien, who were going to conduct the move. Baird was inside for 20-30 minutes waiting for DeWitt to finish a telephone call and give him the keys. When Baird came back outside with the keys, the unit was in the process of being moved. There was a blue tarp on the locomotive, and Baird saw that the tarp was blowing in the wind in a dangerous manner, so he radioed for the locomotive to be stopped so the tarp could be secured. Dkt. No. 44-1 at 66. King instructed Emilien to hold one side of the tarp while King held the other, and Baird then acted as the ground guide for the remainder of the move, which was about ten feet into the building. Baird did not check for a blue flag at that point because the move was already in progress.

King reported that the locomotive had been blue flagged when it was moved. Specifically, King went to DeWitt's office and told him that "[Baird] had just moved in a unit that was Blue Flagged." Dkt. No. 44-5 at 37. Another employee, Scott Delaney, who was a Safety Committee Member, texted Safety Manager David Delong and told him that a unit with a blue flag on it had been moved inside. Delong called DeWitt to report the incident.

DeWitt conducted an investigation of the incident, which included taking a statement from Baird later that day. Baird testified that his conversation with DeWitt went as follows:

> I walked in, and the first thing that Brian DeWitt said—he goes, I was told that you brought a unit in that was under blue flag. And I said, no, sir, I did not. And he goes, well, did the 046 get brought in, the repower? I said yeah. It was brought in this morning. And he goes, well, who brought it in? I said, [Emilien] and [Howard]. That's who you told me, you know, to let them run the show. Since it was snowing, I was more than obliged to stay in the building. And he goes, was it blue flagged? I said, not to my knowledge. I never went out to the unit to look due to the fact it had been moved from where it was at the night before over to underneath the fueling station, so it should have been yellow flag.

Dkt. No. 44-1 at 66. In an Incident Witness Statement Form completed that day, Baird wrote:

12

> I instructed Jake and Damon to hook [units #4 and unit #33] so we could bring it in. I did not notice it blue flagged. I was unlocking derailer for Ronnie King and clearing the line and changing flags. As unit came in the tarp was hanging up on fans . . . . Never double check[ed] the flags on #4.

Dkt. No. 44-2 at 60. DeWitt asked Baird not to include any additional information on the form.

Emilien told DeWitt that the locomotive was not blue flagged when it was moved. DeWitt completed a Property Damage or Near Miss Investigation Report in which he stated:

> While moving [a locomotive] inside to location 6C, the unit was coupled to and moved while under blue flag protection.

> Dewayne Baird was the ground guy, prior to movement he left the area to retrieve derailer keys. Returned and gave the keys to Ronnie King. [Emilien] guided [Howard] (operating power unit) to the threshold of the building and stopped the movement. A large tarp covering [the locomotive] was blowing around and needed secured. Once the tarp was secured, Dewayne assumed the role of ground guy and continued to move into the building. Once in the building and at a stop, Ronnie King noticed that the unit was blue flagged.

> Jacob Howard, the operator of the power unit was not in a position to see any blue flag protection on [the locomotive].

> Dewayne Baird, ground guide was outside on the operator's side of locomotive, watched the movement until it reached the door then guided it inside the rest of the way. Stated he never double checked to see if the unit had blue flags.

> Dameon Emielen [sic], ground guide, assisted with coupling power unit to [the locomotive] and then guiding to door threshold. Stated the [sic] Dewayne and he were ground guides and no persons were on the locomotive.

Dkt. No. 46-13. DeWitt, who had the authority to terminate employees, recommended that Baird be terminated.

As Safety Manager, DeLong was consulted regarding Baird's termination because it involved a safety violation. DeLong concurred with DeWitt's recommendation. During his deposition, DeLong could not recall a time that he did not concur with a termination recommendation about which he was consulted. DeLong based his conclusion on information

provided to him by DeWitt. He was not aware that Baird was not present when Emilien and Howard began moving the locomotive. DeLong testified at his deposition that if, in fact, Baird came out while the locomotive was already being moved, it would have been reasonable for him not to check for blue flags. Dkt. No. 44-3 at 16. DeLong read Baird's statement to mean that Howard and Emilien had coupled to the locomotive while Baird was outside with them, and then Baird had gone inside to get the final derailer unlocked so that the locomotive could go inside. DeLong inferred that from Baird's statement that he was "changing flags," because, as DeLong explained, "you have to change the flags before you even couple to the unit." *Id.* In fact, Baird testified at his deposition that "changing flags" in his statement referred to the fact that while he was inside he changed the flags on another locomotive. Dkt. No. 44-1 at 60.

Ulrich, as HR Manager, typically weighed in on any termination decision. She concurred with DeWitt's recommendation that Baird be terminated. Like DeLong, Ulrich could not recall ever disagreeing with a manager's termination recommendation. Ulrich also based her conclusion on information provided by DeWitt.

The day after the incident, Baird was informed that his employment was terminated for a blue flag violation. Baird then went home and called Progress Rail's Integrity Line to report that he believed he had been unjustly terminated. Regional Director of Safety John Miller then conducted his own investigation, ultimately concluding that Baird "was disciplined correctly based on his actions associated with this incident due to his failure to verify blue flag protection and moving the unit under this protection." Dkt. No. 44-12 at 29.

# IV. DISCUSSION

Baird asserts claims against Progress Rail for violation of the Family Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act. Progress Rail moves for summary judgment on all claims.

## A. The Reply Brief

Before turning to the merits, the Court must address the surprisingly, and disappointingly, vitriolic tone of Progress Rail's reply brief. Progress Rail's implicit comparison of Baird's response brief to the brief the Court found problematic in *Riley v. City of Kokomo* is inapt. Baird's brief presents orderly arguments supported by record citations. The Defendant makes much of the fact that the Plaintiff cited to pages of his discussion section for some of the facts in his statement of material facts, arguing that the Plaintiff "cite[s] to dozens of pages of <u>argument</u>, selfishly sending the Court (and Defendant) poking through a muddled morass of inadmissible conclusions." Dkt. No. 59 at 9. However, the Plaintiff's brief contains a Statement of Facts with clear record citations that satisfies the Plaintiff's obligation to "support each fact the party asserts in a brief with a citation to [evidence of record]." Local Rule 56-1(e). The Plaintiff's Statement of Material Facts in Dispute satisfies the Plaintiff's obligation to "identif[y] the potentially determinative facts and factual disputes that the party contents demonstrate a dispute of fact precluding summary judgment," Local Rule 56-1(b), and directs the reader to those portions of the brief in which each of the identified facts is addressed. It is not at all difficult to discern what evidence of record the Plaintiff believes is relevant to each factual assertion he makes.

While not all of the inferences urged by Baird are supported by the evidence of record, the Court finds the arguments in the response brief to be within the bounds of zealous advocacy. Indeed, Progress Rail's reply brief comes closer to crossing that boundary. For example, the

reply brief includes the following statement: "Before [a plaintiff] can benefit from a favorable view of evidence [not uncorroborated, self-serving testimony], he must first actually place evidence before the Court.'" *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010)." Dkt. No. 59 at 3 (brackets in brief). The bracketed phrase added by the Defendant changes the meaning of the quote entirely. Indeed, two sentences later the court noted that "uncorroborated, self-serving testimony, '[i]f based on personal knowledge or firsthand experience,' may prevent summary judgment against the non-moving party, as 'such testimony can be evidence of disputed material facts.'" *Montgomery*, 626 F.3d at 389 (quoting *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (wherein the court noted "It is worth pointing out here that we long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving'"). By adding the bracketed language to the quote from *Montgomery*, the Defendant implies exactly the opposite.

One final example will suffice. The reply brief contains the following statement:

Baird also misrepresents the facts by claiming he "was still harmed by his reduced raise because everyone got an additional $4 raise in 2016 in addition to their normal percentage raise." (Dkt. 45, pp. 17-18) That not accurate. The raises given in August 2016 ranged from $2.89 to $3.77, to bring newer Test Technicians like Baird to $26.50 regardless of their merit raises for 2015, not *in addition to* their merit raises.

Dkt. No. 59 at 22-23. The quoted language does not actually appear in Baird's brief; the brief actually reads as follows:

Defendant also argues that Mr. Baird's reduced raise was not a harm to him because everyone received an additional $4.00 raise in 2016. [Def. Br. at 9-10.] However, since everyone got a $4.00 raise in addition to their normal percentage raise, Mr. Baird was still harmed by his reduced raise and thus subject to an adverse employment action.

16

Dkt. No. 45 at 17-18.  Progress Rail is correct that Baird's argument is incorrect and based on a false premise—that the relevant employees received a $4.00 raise.  However, Progress Rail itself interjected that false premise by including the following in its Statement of Undisputed Material Facts:

> In August 2016, Baird and other Test Technicians received a $4 raise bringing his pay from $22.73 to $26.50 per hour, or a 16% increase from his 2015 pay. (Baird Dep. pp. 191-192; Ulrich Dep. Ex. 15; DEF244-DEF250).

Dkt. No. 43 at 9.  While it was not inappropriate for Progress Rail to point out the flaw in Baird's argument, it was inappropriate for it to fail to acknowledge that its own brief was the genesis of the factual misrepresentation, especially in light of the fact that Baird accurately cites to Progress Rail's brief as support for the fact.[12]

Counsel should, of course, correct material inaccuracies and misrepresentations that appear in opposing parties' briefs.  "[B]ut we expect [] lawyers to be temperate," *Jeroski v. Fed. Mine Safety & Health Review Comm'n*, 697 F.3d 651, 656 (7th Cir. 2012); tone is important.  It is also important that complaints about the opposing party's brief be scrupulously accurate and not detract from the arguments necessary to support one's own case.  Expecting the Court to sift through indignant statements in a brief to find the relevant legal arguments is never advisable.

### B.  FMLA Claims Based on 2015 Performance Rating and 2016 Raise

Baird asserts that Progress Rail violated the FMLA when DeWitt took his FMLA leave into account when arriving at his 2015 performance rating and related 2016 raise.

> The FMLA generally provides eligible employees suffering from a serious medical condition with as many as twelve weeks of unpaid leave during any

---

[12]Indeed, Progress Rail's opening brief repeats the (incorrect) assertion that Baird received a $4 an hour raise in the argument section.  *See* Dkt. No. 43 at 21.

twelve-month period.  29 U.S.C. § 2612(a)(1)(D).  Employers are prohibited from both interfering with, *id.* § 2615(a)(1), and retaliating against, *id.* § 2615(a)(2), an employee's use or attempted use of FMLA leave.  The difference between the two theories is that a retaliation claim requires the employee to prove discriminatory or retaliatory intent while an interference claim only requires the employee to prove that the employer denied him entitlements provided by the Act.

*Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012) (citing *Kauffman v. Fed. Express Corp.,* 426 F.3d 880, 884 (7th Cir. 2005)).  Baird asserts both an interference and a retaliation claim.

### *1.  Interference*

Under the FMLA, it is "unlawful for [an] employer to interfere with, restrain, or deny" an employee's "exercise of or . . .  attempt to exercise[ ] any right provided under" the Act.  29 U.S.C. § 2615(a)(1).  To prevail on an FMLA-interference claim, a plaintiff must show that

> (1) he was eligible for the FMLA's protections,
> (2) his employer was covered by the FMLA,
> (3) he was entitled to leave under the FMLA,
> (4) he provided sufficient notice of his intent to take leave, and
> (5) his employer denied [or interfered with] . . . FMLA benefits to which
>      he was entitled.

*Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015) *(*quoting *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 635-36 (7th Cir. 2009) (internal quotation marks omitted) and citing *Pagel v. TIN Inc.,* 695 F.3d 622, 627 (7th Cir. 2012)).  Progress Rail does not dispute that Baird satisfies the first four elements, but argues that Baird cannot establish the final element because "Progress Rail never denied or deprived Baird of his FMLA entitlement.  He requested, was granted, and/or took intermittent FMLA leave throughout his employment"; indeed, Baird conceded that he "received all the FMLA he asked for."  Dkt. No. 43 at 19-20 (citation and internal quotation marks omitted).  However,

> [t]he implementing regulations make clear that the ways in which an employer may interfere with FMLA benefits are not limited simply to the denial of leave.  Interference also encompasses "us[ing] the taking of FMLA leave as a negative

factor in employment actions" and "discouraging an employee from using such leave." 29 C.F.R. § 825.220(c),(b); *see also Pagel,* 695 F.3d at 631.

*Preddie*, 799 F.3d at 818. Thus, while Progress Rail is correct that Baird concedes that he was never denied FMLA leave that he requested, there is no question that Baird nonetheless has pointed to evidence from which a reasonable jury could find Progress Rail liable for interfering with Baird's FMLA leave.

Indeed, the evidence of record from which the jury could conclude that DeWitt considered Baird's FMLA leave in completing his performance evaluation is substantial. The jury would not have to rely solely on Baird's testimony that DeWitt told him that his FMLA leave was the reason he received a poor rating and told to "work on his attendance," although that would be sufficient. In fact, this is one of those rare cases that contains a virtual admission of improper conduct by the defendant, in the form of Ulrich's own notes regarding her discussion with DeWitt and her subsequent meeting with DeWitt and Baird. Ulrich recorded that "[DeWitt] considers attendance to be all encompassing of time away from work not just occurrences [that cause points to be assessed under the progressive attendance policy]. [Baird] happens to be on FML which causes him to be away from work," Dkt. No. 44-7 at 28, and that during the meeting DeWitt told Baird "[I]t's your overall absences, including your FML. You have had more time away from work than others, which has impacted your training time." Dkt. No. 44-5 at 30. While Progress Rail points to other statements made by DeWitt that he did not mean that he had held Baird's FMLA leave against him, there is simply no question that a reasonable jury could conclude from Progress Rail's own evidence that, in fact, Baird's FMLA leave was the reason he

received a rating of "Did Not Meet Performance Expectations" in the category of Quality and Quantity of Work.[13]

Progress Rail further argues that Baird has no evidence that he would have received more than a 1% raise but for his FMLA leave. It is true that DeWitt did not concede that fact, testifying that he did not know whether Baird would have received a larger raise if he had been rated as meeting expectations in the Quality and Quantity of Work category. However, the Court finds that a reasonable juror could conclude based on the evidence of record that Baird's poor rating in that category was used "as a negative factor in [the] employment action" of determining Baird's merit raise in January 2016. The parties offer dueling evidence regarding the performance reviews and corresponding raises given to other employees, but the Court need not untangle that morass, because the evidence cited above, if credited by the jury, would clearly support a finding that Baird's raise was based on his overall performance and that DeWitt had a

---

[13]Progress Rail attempts to distinguish between DeWitt considering the fact that Baird took FMLA leave and considering the fact that, as a result of missing work while on leave, Baird missed out on training opportunities and therefore did not perform as well. This ignores the fact that while "[t]he FMLA does not require an employer to adjust its performance standards for the time an employee is actually on the job, . . . it can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave." *Pagel*, 695 F.3d at 629. Thus,

> In *Lewis v. School District # 70*, 523 F.3d 730, 743 (7th Cir. 2008), . . . [the Seventh Circuit] reversed the district court's grant of summary judgment for the employer on an FMLA claim. There, the employee offered evidence that her employer had expected her to complete all the duties of a full-time bookkeeper while she was taking intermittent FMLA leave, and then fired her for failing to meet that full-time standard. *Id.* at 736-37. [The court] concluded that the performance problems that supposedly justified the termination were a direct result of her FMLA leave so that termination for those reasons would have made her FMLA leave "illusory." *Id.* at 743.

*Pagel*, 695 F.3d at 629.

poor view of that performance based in large part on Baird's time away from work, which

consisted almost exclusively of his FMLA leave.

### 2. Retaliation

Baird also asserts a claim of FMLA retaliation in the form of a lower 2016 raise.

> Employers are also prohibited from retaliating against an employee that exercises
> or attempts to exercise FMLA rights. 29 U.S.C. § 2615(a)(2).  In other words, the
> employer cannot use an employee's use of FMLA leave as a negative factor in
> promotion, termination, and other employment decisions.  *Breneisen v. Motorola,*
> *Inc.*, 512 F.3d 972, 978 (7th Cir. 2008).  "We evaluate a claim of FMLA
> retaliation the same way that we would evaluate a claim of retaliation under other
> employment statutes."  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir.
> 2004).

*Pagel*, 695 F.3d at 631.  Therefore, in order to survive summary judgment on his retaliation

claim, Baird must identify evidence showing that (1) he engaged in a statutorily protected

activity; (2) he suffered an adverse employment action; and (3) there is a causal connection

between the two.  *Guzman v. Brown Cty.*, 884 F.3d 633, 642 (7th Cir. 2018).  There is no dispute

that Baird engaged in statutorily protected activity when he took FMLA leave.  Progress Rail

argues that Baird's claim fails as to the two remaining requirements.

First, Progress Rail argues that receiving only a 1% raise was not an adverse employment

action because "Progress Rail's merit raises are wholly discretionary, as evidenced by the fact

that even employees who received similar overall rankings did not receive identical raises."  Dkt.

No. 43 at 22.  Progress Rail then cites *Lewis v. City of Chicago*, 496 F.3d 645, 653-54 (7th Cir.

2007), for the proposition that "'wholly discretionary' payments are not adverse action[s]."

However, *Lewis* in fact notes that the Seventh Circuit has

> held that a denial of a raise can be an adverse employment action while the denial
> of a "more transient" payment such as a bonus is not.  *Barricks v. Eli Lilly and*
> *Co.*, 481 F.3d 556, 559 (7th Cir. 2007) (citing *Farrell v. Butler Univ.*, 421 F.3d
> 609, 614 (7th Cir. 2005); *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014,

> 1030 (7th Cir. 2003); *Hunt* [*v. City of Markham, Ill.*, 219 F.3d [649,] 654 (7th Cir. 2000)). "The difference is that raises are a normal and expected element of an employee's salary, while bonuses generally are 'sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer.'" *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001) (quoting *Hunt*, 219 F.3d at 654).

And, indeed, *Hunt*, quoted in *Lewis*, expressly held that the rule set forth in *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1006 (7th Cir. 2000), that the denial of a bonus is not an adverse employment action "does not extend to raises." *Hunt*, 219 F.3d at 654. The court reasoned that, unlike bonuses,

> [r]aises are the norm for workers who perform satisfactorily. When there is inflation, raises are necessary to keep the worker's wages from falling in real terms. The rate of inflation in the United States is no longer high, but it is positive, so that denying a raise to an employee means cutting his wage in real terms. And raises are the norm quite apart from inflation. They reward the increased productivity that comes with experience on the job, satisfy expectations for a rising standard of living, and combat the "last period" problem (the incentive for a worker to slack off as he approaches retirement) by making it costly to the worker to be fired (because he will lose a wage made generous by steady raises).

*Id.* at 654. It was disingenuous for Progress Rail to suggest that *Lewis* held otherwise. Further, as discussed above, there is evidence of record from which a jury reasonably could find a causal connection between Baird's failure to receive greater than a 1% raise[14] in 2016 and his FMLA leave.

For all of the above reasons, Progressive Rail's motion for summary judgment is **DENIED** with regard to Baird's FMLA interference and retaliation claims with regard to his 2016 raise.

---

[14]While it is true that Baird was not denied a raise entirely, the Court finds that an employee who receives a smaller merit raise than he otherwise would have because he took FMLA leave has suffered an adverse employment action because of protected activity.

## C.  FMLA Retaliatory Discharge Claim

Baird also asserts a claim for retaliatory discharge under the FMLA.  Again, in order to survive summary judgment on this retaliation claim, Baird must identify evidence showing that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two.  *Guzman v. Brown Cty.*, 884 F.3d 633, 642 (7th Cir. 2018).  There is no dispute that Baird engaged in statutorily protected activity:  he took FMLA leave and he complained that it was held against him by DeWitt.  There also is no dispute that Baird's termination was an adverse employment action.  The question, then, is whether Baird has pointed to evidence from which a reasonable jury could find a causal connection between the two.[15]

In a retaliation claim,

causation can be established by circumstantial evidence, which includes, for example, "suspicious timing, a pretextual explanation for the termination, and evidence that similarly situated employees were treated differently."  *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016).  This list is not exclusive; the plaintiff can point to any "other evidence from which an inference of discriminatory intent might be drawn."  *Id.* at 1019.

*Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018).   As discussed above, the evidence of record when viewed in the light most favorable to Baird would support a finding that DeWitt

---

[15]Baird argues that "he may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'"  Dkt. No. 45 at 16 n.9 (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)).  While that was the law at one time, the Supreme Court held in *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338 (2013), that "Title VII retaliation claims must be proved according to traditional principles of but-for causation."  Because retaliation claims under Title VII, the ADA, and the FMLA are all evaluated in the same manner, *see Freelain v. Vill. of Oak Park*, 888 F.3d 895, 900-01 (7th Cir. 2018), more recent Seventh Circuit cases apply the but-for causation standard to FMLA retaliation cases as well.  *See, e.g.*, *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015); *see also Riley*, 909 F.3d at 188.

harbored animus toward Baird because of his FMLA leave.  Baird also points to evidence that

DeWitt assigned Baird undesirable jobs after Baird complained of FMLA discrimination.

Finally, Baird points to evidence from which a reasonable jury could conclude that DeWitt's

recommendation that Baird be terminated for a blue flag violation was pretextual.[16]  Specifically,

considering the evidence in the light most favorable to Baird, a jury reasonably could conclude

that Baird did not actually commit a blue flag violation because he was inside at the time that his

coworkers began moving the locomotive.  This is supported by Baird's testimony about what

happened and DeLong's testimony that if, in fact, Baird's version is correct, Baird was not

responsible for checking for blue flags.  Baird's testimony would also support a finding that

DeWitt was aware of Baird's version of events because Baird told him what had happened.

Indeed, neither Baird's Incident Witness Statement Form nor DeWitt's Property Damage or Near

Miss Investigation Report contradicts Baird's version of events.  The former, while not a model

of clarity, notes that Baird instructed Howard and Emilien to couple the unit, and the latter

specifically notes that Baird left the area "prior to movement" and that Baird "assumed the role

of ground guy" only after the unit had been moved "to the threshold of the building."  Dkt. No.

46-13.  This evidence that Baird did not actually commit a blue flag violation supports a finding

of pretext, and thus a finding of retaliation.  *See O'Connor v. DePaul Univ.*, 123 F3d 665, 670

(7th Cir. 1997) (noting that "[t]he honesty of [a decisionmakers's] belief could be called into

---

[16]Baird points to a variety of additional evidence that he argues supports the requisite
inference of discriminatory intent.  The Court need not address that additional evidence because
the evidence discussed above, if credited by the jury, would be sufficient to support of finding of
retaliation.

question by evidence suggesting that the events did not actually happen") (citing *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995)).

Progress Rail points to other evidence of record—including the investigation that was conducted after Baird's termination—as demonstrating that Progress Rail's decision to terminate Baird was based on a belief that he had committed a blue flag violation. A reasonable jury certainly could credit that evidence, discredit Baird's testimony, and agree with Progress Rail. A reasonable jury also could determine that a blue flag violation did not actually occur, but that the decisionmakers believed that it did, and find that that belief was the reason for Baird's termination. However, at the summary judgment stage, the proper question is not whether a reasonable jury could find in favor of Progress Rail—or even whether that is likely to occur—but rather, considering the evidence in the light most favorable to Baird, a reasonable jury could conclude that DeWitt recommended Baird's termination[17] in retaliation for Baird taking FMLA leave and/or complaining that DeWitt improperly considered Baird's FMLA leave in completing his performance review and determining his raise.

For all of the reasons set forth above, Progress Rail's motion for summary judgment is **DENIED** with regard to Baird's FMLA retaliation claim based upon his termination.

---

[17]Progress Rail asserts that the decision to terminate Baird was made by DeWitt, DeLong, and Ulrich. However, as Baird correctly points out, there is evidence that would support a finding that DeLong and Ulrich simply agreed with DeWitt's recommendation based on information provided to them by DeWitt. "If a person with retaliatory animus 'provided factual information or input that may have affected the adverse employment action,'" then the employer still can be liable for a retaliatory firing. *Donley v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018) (quoting *Matthews v. Waukesha County*, 759 F.3d 821, 829 (7th Cir. 2014)).

### D.  ADA and Rehabilitation Act Claims

Finally, Baird asserts that his termination also violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794.  To survive summary judgment on either claim, Baird "must identify evidence showing that (1) [he] engaged in a statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the two."  *Guzman v. Brown Cty.*, 884 F.3d 633, 642 (7th Cir. 2018).  Baird argues that his "retaliatory discharge claims under the ADA, Rehabilitation Act, and FMLA run concurrently since his FMLA requests were also requests for reasonable accommodations and requests for reasonable accommodations are protected activity under the ADA."  Dkt. No. 45 at 19.  But Baird points to no evidence that either he or Progress Rail understood at any time that he was requesting an accommodation of a disability when he requested or used FMLA leave.  And while Baird correctly notes that the Seventh Circuit has held that "'time off may be an apt accommodation for intermittent conditions,'" Dkt. No. 43 at 19 (quoting *Severson v. Heartland Woodcraft, Inc.*, 328 F.3d 379 (7th Cir. 2003), he fails to articulate how the leave he requested and took was a reasonable accommodation for his disability.  "It is not this court's responsibility to research and construct the parties' arguments," *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011), and that is what the Court would have to do in this case in order for Baird's ADA and Rehabilitation Act claims to survive summary judgment.  Accordingly, Progress Rail's motion for summary judgment is **GRANTED** with regard to those claims.

## V. **CONCLUSION**

For the reasons set forth above, Progress Rail's motion for summary judgment is

**GRANTED** with regard to Baird's claims under the ADA and the Rehabilitation Act, and

**DENIED** with regard to Baird's FMLA claims.

SO ORDERED: 5/21/2019

_William T. Lawrence_

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification